ORIGINAL

ECF

FILED
JUN 2 1 2006
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DATA MONITOR SYSTEMS, INC., | § | |
| Plaintiff, | § | |
| | § | No. 06-471-C |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | **BID PROTEST** |
| | § | **REDACTED** |
| Defendant. | § | |

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FILED UNDER SEAL

TO THE HONORABLE JUDGE OF SAID COURT:

Now Comes Plaintiff, Data Monitor Systems, Inc., by and through its undersigned counsel, and alleges the following for its Complaint:

## JURISDICTION

1. Jurisdiction in this action is conferred on this Court by 28 U.S.C. § 1491(b)(1). This is an action by an interested party objecting to award of a federal procurement contract and related violation of statute or regulation in connection with a procurement.

## PARTIES

2. The Plaintiff, Data Monitor Systems, Inc. ["DMS"] is incorporated pursuant to the laws of the State of Oklahoma, with its principal offices at 1455 S Douglas Blvd, Suite A, Midwest City, Oklahoma 73130.

3. Defendant, United States of America, acting through the United States Department of the Air Force, [the "Government"], an executive agency of the federal government, issued the solicitation challenged herein. The contracting officer for the

awarded contract is Ms. Jana P. McNeal, Contracting Division, HQ AFRC/LGCP, 1000 Corporate Pointe, Warner Robins, GA 31088-3430.

ALLEGATIONS

The Solicitation

4. Solicitation number FA6634-05-R-0006 was issued by the United States Air Force on June 6, 2005. This acquisition was conducted as a small business set aside for firms not exceeding the SBA determined limit in average annual revenue for procurements classified under North American Industrial Classification System (NAICS) Code 561210 "Facility Support Services". The Solicitation sought offers to perform base support services for Grissom AFB for a period of one year plus nine (9) option years.

5. The range of services sought to be procured includes contractor support for all major functions of the base, including Base Supply, Motor Vehicle Management (MVM), Traffic Management Operations (TMO), Transient Aircraft Services (TAS), Real Property Maintenance (RPM) (including RPM and real property services (RPS)), Fuels Management, Airfield Management and Meteorological Services. In addition to firm fixed price (FFP) line items for these functions, the solicitation also included time and materials (T&M) line items for RPM/S service calls, over and above work, reimbursable direct parts and materials, reimbursable crisis/natural disaster support and reimbursable travel (including Government-directed training).

The evaluation criteria for award were described in Section M-3 of the Solicitation "Evaluation Criteria" as follows:

> The Government will select the best overall offeror based on best value determined by Performance Price Tradeoff (PPT). The first step in the PPT is to determine whether offerors' technical proposals are acceptable or unacceptable. Among technically acceptable proposals, tradeoffs may then be made between Present/Past Performance and Cost/Price to determine the successful offeror. For the purposes of this PPT, assessment of relative capability to meet performance requirement and is significantly more important than Evaluated Price in the evaluation. Evaluation of Present/Past Performance and Cost/Price may be concurrent with evaluation of technical acceptability, however, once a proposal is deemed technically unacceptable further evaluation of that proposal will cease. The Government will award to the offeror who gives the Air Force the greatest confidence of meeting or exceeding the technical requirements affordably. This may result in an award to a technically acceptable/higher priced offeror where the Source Selection Authority (SSA) reasonably determines the superior Present/Past Performance of the higher price offeror outweighs the cost difference. While the Government Source Selection Evaluation Team (SSET) and the SSA will strive for maximum objectivity, the source selection process, by its nature, is subjective and, therefore, professional judgment is implicit throughout the entire process. Proposals will be evaluated based solely on the factors contained in this solicitation.

12. Current/Past Performance contracts submitted as part of the Performance Volume III were evaluated for recency. "Recency" was defined in the Solicitation as "the period of performance for each past performance contract. The government will not evaluate performance on an effort that concluded more than three years prior to the issuance of this solicitation. Ongoing contracts must have commenced no less than one year before the issuance of this solicitation".

13. If contract performance did not meet the criteria for recency, the contract was not evaluated further. Current/Past Performance contracts submitted as part of the Performance Volume III were also evaluated for relevancy. The data used to determine the relevancy of a past performance reference included data provided by the offerors, as well as data obtained from other sources such as Past Performance Information Retrieval System ["PPIRS"], similar systems of other Government department and agencies, questionnaires tailored to the circumstances of this acquisition, interviews and any other sources known to the Government including commercial sources.

14. Relevancy was evaluated by the agency based on the scope, magnitude, and complexity of the contracts. It determining relevancy for individual contracts, consideration was given to the effort, or portion of the effort, being reviewed and evaluated. The following rating scale was used for relevancy:

> Very Relevant (VR): Past/performance effort involved essentially the same scope, magnitude and complexity of effort which this solicitation requires.
>
> Relevant (R): Past performance effort involved much the same scope, magnitude and complexity of effort which this solicitation requires,
>
> Somewhat Relevant (SR): Past performance effort involved some of the same scope, magnitude and complexity of effort which <u>this</u> solicitation requires.
>
> Not Relevant (NR): Past performance effort did not involved any of the same scope, magnitude and complexity of effort which this solicitation requires

15. An overall past performance rating was made for each offeror's present/past performance. The following rating scale was used:

EXCEPTIONAL: The contractor's performance meets contractual requirements and exceeds many requirements to the Government's benefit the contractual performance was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective.

VERY GOOD: The contractor's performance meets contractual requirements and exceeds some requirements to the Government's benefit. The contractual performance was accomplished with some minor problems for which corrective actions taken by the contractor were effective.

SATISFACTORY: The contractor's performance meets contractual requirements. The contractual performances contained some problems for which corrective actions taken by the contractor appear or were satisfactory.

NEUTRAL: No performance record identifiable.

MARGINAL: The contractor's performance does not meet some contractual requirements. The contractual performance reflects a serious problem for which the contractor has not yet identified corrective actions or the contractor's proposed actions appear only marginally effective or were not fully implemented.

UNSATISFACTORY: The contractor's performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance contains serious problems for which the contractor's corrective actions appear or were ineffective.

16. Present/past performance information was reviewed to make an overall confidence assessment of the offeror's ability to successfully perform the total proposed effort. This assessment resulted in assignment of an overall performance risk rating. The following rating scale was used:

High Confidence: Based on the offeror's performance record, essentially no doubt exists that the offeror will successfully perform the required effort.

Significant Confidence: Based on the offeror's performance record, little doubt exists that the offer will perform the required effort.

Confidence: Based on the offeror's performance record, some doubt exists that the offeror will perform the required effort.

Unknown Confidence: No performance record identifiable.

Little Confidence: Based on the offeror's performance record, substantial doubt exists that the offeror will perform the required effort.

No Confidence: Based on the offeror's performance record, extreme doubt exists that the offeror will perform the required effort.

17. In summary, each individual past performance reference was assigned a relevancy rating. Then, viewing all of an offeror's past performance references, each offeror was assigned adjectival scores for both overall past performance rating and the agency's overall confidence level in that offeror's likelihood of successful performance.

Receipt of Proposals and Conduct of Discussions

18. The deadline for submission of initial proposals was July 21, 2005 at 4:00 PM local time. The agency received [ ] timely proposals.

19. Evaluation notices (ENs), outlining issues regarding which the agency intended to conduct discussions with the offerors were issued to the various offerors between August 12, 2005 and October 20, 2005. Discussions were held with all [ ] offerors remaining in the competitive range.

20. Final Proposal Revisions (FPRs) were requested from the offerors on November 10, 2005. FPRs were received on November 17, 2005 and the agency conducted a final review of all proposal changes.

## <u>Award to Data Monitor Systems, Inc.</u>

21. On December 1, 2005, award was made to Data Monitor Systems, Inc. of Midwest City, Oklahoma for $51,530,704.29 for a term of one base year plus 9 annual options and a short option of 6 months. The unsuccessful offerors were sent notifications of award the same day.

22. In arriving at the decision to award the contract to DMS, the agency determined that DMS was one of [ ] offerors having the most highly rated performance risk assessment of Significant Confidence, meaning that little doubt exists that DMS can successfully perform the required effort. This finding was based on [ ]. DMS demonstrated Very Good past performance in all eight of the functional areas included in the Grissom ARB solicitation.

23. The abstract of offers ranked by technical merit and price was as follows:

| | | | | | |
|---|---|---|---|---|---|
| [ | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | ] |

24. As shown in the above chart, T Square Logistics Services, Inc. ["T Square or T2"] was the [ ] evaluated price offeror but received an overall confidence assessment of [ ], which meant that [ ] their ability to successfully perform all the required effort. Specifically, T Square did not provide any [ ] past performance data and presented only somewhat similar [ ] past performance data which did not include the most critical elements of the requirement: repair and maintenance of facilities. Thus, notwithstanding the [ ] contracts with [ ] performance data which covered [ ] of the eight functions and a very small portion of [ ] function, the agency's overall level of confidence in T Square was rated as [ ].

25. The agency noted that T Square's total evaluated price is $[ ] represented $[ ] lower pricing annually than DMS, a difference of only [ ]%.

26. The agency determined that DMS's superior past performance record which demonstrated its ability to successfully perform all eight functions outweighed the mere [ ]% cost savings offered by T Square's proposal and the accompanying substantially lower performance risk assessment of [ ].

<u>T Square's First Protest</u>

27. T Square requested a debriefing which was provided December 21, 2005. T Square thereafter filed a protest with the General Accounting Office on December 27, 2005, which it supplemented on December 29, 2005. The agency suspended

performance of DMS' contract by notice dated December 29, 2005. DMS intervened in the GAO protest shortly thereafter.

28. In its protest, T Square alleged that its proposal had been improperly evaluated. T Square did not rebut the agency's finding that T Square lacked relevant past performance in [ ]. T Square argued, however, that because it had been rated higher on allegedly similar procurements in the past, it was unreasonable for the agency to rate its proposal lower on the present procurement.

29. T Square also argued that DMS lacked past performance in some functional areas, an incorrect assertion which T Square never substantiated.

30. T Square finally argued that the agency had failed to conduct meaningful discussions because the agency had not questioned T Square regarding its lack of relevant past performance in [ ] during the discussion process. Notably, in none of T Square's protests did it argue that the agency had incorrectly interpreted past performance data. T Square admitted that it lacked past performance in those areas, but alleged that had the agency brought those gaps to T Square's attention, T Square would have added subcontractors with that experience.

<u>GAO Recommends Corrective Action</u>

31. On February 13, 2006, after submission of the agency's protest report, the GAO convened an Alternative Dispute Resolution ["ADR"] teleconference for the purpose of providing outcome prediction to the parties. In that conference, the GAO attorney responsible for the matter indicated that in the her view, because T Square's

lack of past performance [ ] was treated unfavorably by the agency in its evaluation, this constituted "adverse" past performance information upon which the agency was required to conduct discussions with T Square. The GAO gave no indication either in that conference or in its subsequent written decision on protest costs that it considered any other protest allegation to be meritorious.

32. The GAO recommended that the agency conduct discussions, re-evaluate the proposals, and re-accomplish the award decision. The GAO, however, left it to the agency to decide what action should and would be taken.

## <u>The Air Force Implements Initial Corrective Action</u>

33. On March 3, 2006, the agency formally advised the GAO as to the scope of corrective action the agency intended to take. The agency proposed a comprehensive seven part corrective action plan: (1) assign a new evaluator, (2) re-evaluate all offerors that received a "Go" in the "Go/No-Go" technical proposal evaluation for past performance relevance and performance risk, (3) assign a "neutral" performance risk rating for those functional areas in which an offeror lacks past performance experience, (4) re-assess the confidence assessment, (5) prepare a new past performance/cost trade-off analysis and best value determination, (6) prepare a new source selection document, and (7) if any offeror other than the current awardee is determined to be the best value, then terminate the award to DMS, and make award to that offeror.

34. T Square challenged the propriety of the proposed corrective action because it did not necessarily permit T Square to change its entire team structure by adding new subcontractors to improve its score. The GAO, however, expressed no opinion on the propriety of the proposed corrective action.

35. In intervention, DMS pointed out that the real issue was that the functional areas of [ ] in T Square's past performance record should have been treated as "neutral" as required by FAR 15.305(a)(2)(iv). As for discussions, DMS pointed out that under clear GAO case law, the agency had no duty to conduct discussions regarding a lack of relevant past performance unless there was something unclear about the proposal in question, which in this case there was not. Accordingly, if properly scored, T Square was not entitled to discussions on that issue, therefore the agency was not required to provide T Square with discussions as part of its corrective action.

36. The GAO dismissed the protest as mooted by the corrective action, noting that if T Square were unhappy with the result, it could always protest again. The GAO expressed no opinion as to the propriety of the agency's corrective action plan.

37. In the meantime, the stop work order on DMS's awarded contract remained in place, costing DMS performance time on the contract (and related profit), as well as continually accumulating unabsorbed overhead costs.

Second Award To Data Monitor Systems, Inc.

38. After dismissal of the protest, the agency implemented its proposed corrective action plan. To the best of DMS' knowledge, the agency implemented the

plan exactly as it had proposed to GAO. On May 23, 2006, the agency announced its new award decision, which again found DMS' proposal to offer the best value to the Government.

Second T Square Protest

39. On May 30, 2006, T Square again protested to the General Accounting Office. T Square's protest indicated that in the re-evaluation, the agency had treated T Square's lack of past performance as "neutral", as the agency had indicated to GAO it would do. T Square's protest also indicated that as a result, T Square's overall confidence rating was raised from the previous [ ] to [ ]. Nevertheless, T Square remained unhappy with the ultimate result and argued again that the agency was required to conduct discussions with T Square to permit T Square to entirely change the composition of its contracting team entirely so that it could add subcontractor experience it decided not to add in its initial proposal.

Second Proposed Corrective Action

40. On June 13, 2006, the agency informally advised DMS that it intended to institute yet another round of corrective action. Moreover, the agency proposed to terminate DMS' contract in the meantime, rather than leave the contract in place as it had done before. The stated basis for this action was change in the performance period (as a sole result of protest delays), a revision to the Department of Labor wage determination, and unspecified changes to the Performance Work Statement.

41. Changes in the performance period to account for protest delays, and incorporation of revised minimum wage determinations are matters normally handled post-award via routine contract modification and are not cardinal changes that require a new competition. Furthermore, on information and belief, the proposed changes to the PWS are minor in nature, completely within the scope of the Changes clause, and likewise are not cardinal changes of the type that require a new competition.

42. It is DMS' belief, based upon the agency's action, that its decision to take corrective action yet again was not motivated by either needed changes to the Solicitation, nor a belief on the part of the agency that it had committed any impropriety in the administration of the first corrective action. Rather, the agency expressed a concern that the GAO mighty rule that discussions were required even though such a ruling would be contrary to GAO precedent, and even though GAO had expressed no opinion regarding the propriety of the corrective action when it was proposed. This is not a rational basis for corrective action, particularly when that corrective action would deprive DMS of its contract and allow other offerors to submit revised proposals after DMS's price and some technical evaluation information had been given to other offerors in then technical debriefing a substantial competitive disadvantage due to exposure of its price and overall scoring to all other offerors.

## Injunctive Relief

43. If the agency is not enjoined, it will immediately terminate the contract awarded to DMS, thereby directly harming DMS.

44. Further, the agency proposes to proceed with further competition and permit submission of revised proposals after DMS' price and overall scoring has been exposed to all other competitors. DMS, by contrast, has no information regarding the prices and scores of any of its competitors. Accordingly, not only will DMS be deprived of a contract it fairly won twice, it will be placed at a significant competitive disadvantage in winning the contract a third time. This is a further immediate irreparable harm of the agency's proposed course of action.

45. DMS has no adequate remedy at law. If its contract is terminated for the Government's convenience, DMS is precluded by law from recovering the profits it would have earned on its $52 million contract, nor is there any remedy for that adequate competitive harm DMS will suffer.

46. DMS has a substantial likelihood of prevailing on the merits. The lack of past performance in T Square's proposal for the functional areas of [ ]. The provisions of the FAR regarding the evaluation of gaps in past performance are clear. It is likewise clear that an agency is not required conduct discussions regarding gaps in past performance. Accordingly, the agency's corrective action is unreasonable. The agency has committed no legal error, and its decision to take corrective action is not motivated out of a credible belief that it has actually committed legal error.

47. No harm will result to the Government as a result of issuance of injunctive relief. The Government was not proposing to award the contract to T Square or anyone else, but instead proposed to start the proposal evaluation process all over again for a third time. Neither T Square nor DMS is the incumbent, therefore regardless of whether

injunctive relief is or is not issued, the Government will continue to obtain service via extension of the incumbent contract for these services.

48. For that same reason, no harm will result to any third party. Certainly no harm will result to T Square, as it has never been selected for award, and stands no greater chance of receiving award in a third round of competition than any other offeror.

49. Accordingly, DMS submits that issuance of temporary and preliminary injunctive relief pending a final determination of the merits of this matter is appropriate.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that upon review of this matter, this Court grant the following relief:

a. Take jurisdiction of this action;

b. Expedite the hearing of this action;

c. Issue a Temporary Restraining Order prohibiting both termination of DMS' awarded contract and re-opening of competition pending a hearing on DMS's motion for preliminary injunction; and

d. Issue a Preliminary Injunction prohibiting both termination of DMS' awarded contract and re-opening of competition pending final hearing on this matter;

e. Issue permanent declaratory relief providing that the complained of termination of DMS' contract and re-opening of competition is illegal; and

f. Such other appropriate relief to which Plaintiff is entitled.

Dated: June 20, 2006

Respectfully Submitted,

Johnathan M. Bailey
SBN 24000009

BAILEY & BAILEY, P.C.
Milam Building, Suite 711
115 East Travis Street
San Antonio, Texas 78205-1611
Telephone: (210) 225-7747
Facsimile: (210) 225-8246

Attorney for Plaintiff
Data Monitor Systems, Inc.

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Complaint for Declaratory and Injunctive Relief has been caused to be delivered by Overnight Delivery to the following this 19th day of June, 2006, by the undersigned.

Michael Dufault
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Facsimile (202) 305-7644
Airbill Number 851298456755

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Facsimile (202) 305-7644
Airbill Number 851298456777

Ms. Jana P. McNeal
Contracting Division
HQ AFRC/LGCP
1000 Corporate Pointe
Warner Robins, GA 31088-3430
Airbill Number 851298456766

JOHNATHAN M. BAILEY