ORIGINAL

FILED
JUN 2 1 2006
U.S. COURT OF FEDERAL CLAIMS

ECF

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DATA MONITOR SYSTEMS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. 06-471-C |
| vs. | § | |
| | § | BID PROTEST |
| UNITED STATES OF AMERICA | § | |
| | § | REDACTED VERSION |
| Defendant. | § | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Johnathan M. Bailey
Bailey & Bailey, P.C.
115 East Travis Street, Suite 711
San Antonio, Texas 78205
Telephone: 210 225 7747
Facsimile: 210 225 8246

Attorney for Plaintiff,
Data Monitory Systems, Inc.

TABLE OF CONTENTS

I. Issues Presented ........................................ 1

II. Statement of the Case ........................................ 1

A. The Solicitation ........................................ 1

B. Proposal Instructions ........................................ 2

C. Evaluation Criteria ........................................ 3

D. Receipts Of Proposals And Conduct Of Discussions ........................................ 7

E. Award To Data Monitor Systems, Inc. ........................................ 8

F. T Square's First Protest ........................................ 9

G. GAO Recommends Corrective Action ........................................ 10

H. The Air Force Implements Corrective Action ........................................ 11

I. Second Award To Data Monitor Systems, Inc. ........................................ 12

J. Second T Square Protest ........................................ 13

K. Second Proposed Corrective Action ........................................ 13

III. Argument ........................................ 14

A. Jurisdiction And Standard Of Review ........................................ 14

B. The Proposed Corrective Action Addressed The Real Issue Presented-Evaluation Of A Lack Of Past Performance ........................................ 15

C. The Proposed Solicitation Changes Do Not Warrant Re-Opening Competition ........................................ 18

D. The Agency's Decision To Take Corrective Action Is Unreasonable ........................................ 20

E. Criteria For Injunctive Relief ........................................ 23

1. Likelihood Of Success On The Merits ........................................ 24

2. DMS Will Suffer Irreparable Harm If Relief Is Not Granted ........................................ 25

3. The Harm To DMS Outweighs The Harm To The United States..........26

4. Injunctive Relief Will Serve The Public Interest ..................................26

IV. Conclusion ..........................................................................................27

# TABLE OF AUTHORITIES

**Administrative Decisions**

Caltech Serv. Corp, B-261044.4, Dec. 14, 1995, 95-2 CPD para. 285 at 7 n.9 .............. 17
CMC & Maint., Inc., B-292081, May 19, 2003, 2003 CPD para. 107 at 3 ........................ 17
HG Properties A, LP, B- 290,416, B- 290416.2, July 25, 2002, 2002 CPD ¶ 128........... 20
ManTech at 65 citing Patriot Contract Servs., LLC, et al., B-278276.11, 98-2 CPD ¶ 77, at 4 .............................................................................................................. 21
Master Security, Inc. , B- 274,990, B- 274990.2, January 14, 1997, 97-1 CPD ¶ 21 ..... 20
Northrop Grumman Info. Tech., Inc., B-290080 ............................................................ 17
Oshkosh Truck Corp.; Idaho Norland Corp., B-237058.2, B-237058.3, 90-1 CPD ¶ 274, at 4 .............................................................................................................. 21
Radian, Inc., B- 256,313, et al., 94-2 CPD ¶ 104 ........................................................... 21
Rockville Mailing Serv., Inc., 96-1 CPD ¶ 184, at 3 ........................................................ 21
Standard Communications, Inc., B- 296,972, Nov. 1, 2005, 2005 CPD ¶ 200 ............... 16
Standard Communications, supra ................................................................................ 18
Will-Burt Co., B-250626.2, Jan. 25, 1993, 93-1 CPD ¶ 61 ............................................ 21

**Statutes**

10 U.S.C. § 2301 .......................................................................................................... 27
28 U.S.C. § 1491(b)(1) ................................................................................................... 14
5 U.S.C. § 706 (2)(A) ..................................................................................................... 14

**Federal**

Bannum, Inc. v. United States, 60 Fed.Cl. 718 (2004) .................................................. 15
Cardinal Maintenance Services v. United States, 63 Fed. Cl. 98, 107 (2004)............... 20
DGS Contract Serv., Inc. v. United States, 43 Fed.Cl. 227, 238 (1999) ......................... 21
Gentex Corp. v. United States, 58 Fed.Cl. 634, 648 (2003) ........................................... 15
Hunt Building Co., Ltd. v. U.S., 61 Fed.Cl. 243, 269 (2004) .......................................... 15
Info. Tech. & Applications Corp. v. United States, 51 Fed.Cl. 340, 346 (2001).............. 15
Isratex, Inc. v. United States, 25 Cl.Ct. 223 (1992) ........................................................ 25
Magellan Corn v. United States, 27 Fed. Cl. 446, (1993)............................................... 24
ManTech Telecommunications and Information Systems Corp. v. United States, 49 Fed. Cl. 57, 65 (2001) ........................................................................................... 20-21
Quality Transportation Services, Inc. v. United States, 12 Cl.Ct. 276, (1987) ................ 25
Standard Communications ....................................................................................... 22, 23
Standard Communications, Inc. , supra. ....................................................................... 22
TRW Environmental Safety Systems, Inc. v. United States, 16 Ct.Cl. 529 (1989).......... 24
TRW, supra ..................................................................................................................... 25
Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 291 (D.C. Cir. 1959) ..................................................................................................................... 24
Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841 (D.C.Cir. 1972) ........................................................................................................................ 24

**Regulations**

FAR 15.305(a)(2)(iv) ....................................................................................................... 15

FAR 33.101 ........ 18
FAR 33.102(d) ........ 18
FAR 52.222-43 ........ 19
FAR 52.233-1 ........ 18, 19

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DATA MONITOR SYSTEMS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | No. ________________ |
| | § | |
| UNITED STATES OF AMERICA | § | **BID PROTEST** |
| | § | **REDACTED** |
| Defendant. | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

## I. ISSUE PRESENTED

Whether the agency's proposed corrective action in response to T Square's May 30, 2006 GAO protest is reasonable and comports with applicable procurement regulations.

## II. STATEMENT OF THE CASE

### A. The Solicitation

1. Solicitation number FA6634-05R-0006 was issued by the United States Air Force on June 6, 2005. This acquisition was conducted as a small business set aside for firms not exceeding the SBA determined limit in average annual revenue for procurements classified under North American Industrial Classification System (NAICS) Code 561210 "Facilities Support Services". The Solicitation sought offers to perform base support services for Grissom AFB for a period of one year plus nine (9) option years.

2. The range of services sought to be procured includes contractor support for all major functions of the base, including Base Supply, Motor Vehicle Management (MVM), Traffic Management Operations (TMO), Transient Aircraft Services (TAS), Real Property Maintenance (RPM) (including RPM and real property services (RPS)), Fuels Management, Airfield Management and Meteorological Services. In addition to firm fixed price (FFP) line items for these functions, the solicitation also included time and materials (T&M) line items for RPM/S service calls, over and above work, reimbursable direct parts and materials, reimbursable crisis/natural disaster support and reimbursable travel (including Government-directed training).

B. Proposal Instructions

3. In accordance with this criterion, Section L of the Solicitation provided proposal preparation instructions to the offerors to address each area to be evaluated. The proposal preparation instructions required the proposal to include four volumes.

4. Volume I, Administrative/Contract Documentation, was to include a Master Table of Contents, Standard Proposal Information, Contact Information, Teaming Arrangements and/or Letters of Intent, Exceptions to Terms and Conditions, completed Section K and information to demonstrate the offeror met the Minimum Qualifications.

5. Volume II, Program Management/Staffing, was to include Standard Proposal Information and Program Management/Staffing.

6. Volume III, Present/Past Performance, was including Standard Proposal Information, Present/Past Performance General Information, Past Performance Summaries and FACT sheets for a maximum of 15 contracts. Volume III also contained information for the submittal of past performance questionnaires.

7. Volume IV, Cost/Price, was to include sufficient detailed information to explain the correlation of Volume II and Volume IV, that is to show how the proposed staffing and pricing interrelated.

C. Evaluation Criteria

8. This acquisition was solicited as a best value source selection conducted in accordance with Federal Acquisition Regulation (FAR) 15.101.-1, Tradeoff Process. The evaluation criteria for award were described in Section M-3 of the Solicitation "Evaluation Criteria" as follows:

> The Government will select the best overall offeror based on best value determined by Performance Price Tradeoff (PPT). The first step in the PPT is to determine whether offerors' technical proposals are acceptable or unacceptable. Among technically acceptable proposals, tradeoffs may then be made between Present/Past Performance and Cost/Price to determine the successful offeror. For the purposes of this PPT, assessment of relative capability to meet performance requirement and is significantly more important than Evaluated Price in the evaluation. Evaluation of Present/Past Performance and Cost/Price may be concurrent with evaluation of technical acceptability, however, once a proposal is deemed technically unacceptable further evaluation of that proposal will cease. The Government will award to the offeror who gives the Air Force the greatest confidence of meeting or exceeding the technical requirements affordably. This may result in an award to a technically acceptable/higher priced offeror where the Source

> Selection Authority (SSA) reasonably determines the superior Present/Past Performance of the higher price offeror outweighs the cost difference. While the Government Source Selection Evaluation Team (SSET) and the SSA will strive for maximum objectivity, the source selection process, by its nature, is subjective and, therefore, professional judgment is implicit throughout the entire process. Proposals will be evaluated based solely on the factors contained in this solicitation.

9. Current/Past Performance contracts submitted as part of the Performance Volume III were evaluated for recency. "Recency" was defined in the Solicitation as "the period of performance for each past performance contract. The government will not evaluate performance on an effort that concluded more than three years prior to the issuance of this solicitation. Ongoing contracts must have commenced no less than one year before the issuance of this solicitation".

10. If contract performance did not meet the criteria for recency, the contract was not evaluated further. Current/Past Performance contracts submitted as part of the Performance Volume III were also evaluated for relevancy. The data used to determine the relevancy of a past performance reference included data provided by the offerors, as well as data obtained from other sources such as Past Performance Information Retrieval System ["PPIRS"], similar systems of other Government department and agencies, questionnaires tailored to the circumstances of this acquisition, interviews and any other sources known to the Government including commercial sources.

11. Relevancy was evaluated by the agency based on the scope, magnitude, and complexity of the contracts. In determining relevancy for individual contracts,

consideration was given to the effort, or portion of the effort, being reviewed and evaluated. The following rating scale was used for relevancy:

> Very Relevant (VR): Past/performance effort involved essentially the same scope, magnitude and complexity of effort which this solicitation requires.
>
> Relevant (R): Past performance effort involved much the same scope,. magnitude and complexity of effort which this solicitation requires,
>
> Somewhat Relevant (SR): Past performance effort involved some of the same scope, magnitude and complexity of effort which this solicitation requires.
>
> Not Relevant (NR): Past performance effort did not involved any of the same scope, magnitude and complexity of effort which this solicitation requires

12. An overall past performance rating was made for each offeror's present/past performance. The following rating scale was used:

> EXCEPTIONAL: The contractor's performance meets contractual requirements and exceeds many requirements to the Government's benefit The contractual performance was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective.
>
> VERY GOOD: The contractor's performance meets contractual requirements and exceeds some requirements to the Government's benefit. The contractual performance was accomplished with some minor problems for which corrective actions taken by the contractor were effective.
>
> SATISFACTORY: The contractor's performance meets contractual requirements. The contractual performances contained some problems for which corrective actions taken by the contractor appear or were satisfactory.
>
> NEUTRAL: No performance record identifiable.

MARGINAL: The contractor's performance does not meet some contractual requirements. The contractual performance reflects a serious problem for which the contractor has not yet identified corrective actions or the contractor's proposed actions appear only marginally effective or were not fully implemented.

UNSATISFACTORY: The contractor's performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance contains serious problems for which the contractor's corrective actions appear or were ineffective.

13. Present/past performance information was reviewed to make an overall confidence assessment of the offeror's ability to successfully perform the total proposed effort. This assessment resulted in assignment of an overall performance risk rating. The following rating scale was used:

High Confidence: Based on the offeror's performance record, essentially no doubt exists that the offeror will successfully perform the required effort.

Significant Confidence: Based on the offeror's performance record, little doubt exists that the offer will perform the required effort.

Confidence: Based on the offeror's performance record, some doubt exists that the offeror will perform the required effort.

Unknown Confidence: No performance record identifiable.

Little Confidence: Based on the offeror's performance record, substantial doubt exists that the offeror will perform the required effort.

No Confidence: Based on the offeror's performance record, extreme doubt exists that the offeror will perform the required effort.

14. In summary, each individual past performance reference was assigned a relevancy rating. Then, viewing all of an offeror's past performance references, each offeror was assigned adjectival scores for both past performance rating and the agency's confidence level in that offeror's likelihood of successful performance.

D. Receipt of Proposals and Conduct of Discussions

15. The deadline for submission of initial proposals was July 21, 2005 at 4:00 PM local time. The contracting officer received [ ] proposals prior to the established date and time.

16. Evaluation notices (ENs), outlining issues regarding which the agency intended to conduct discussions with the offerors were issued to the various offerors between August 12, 2005 and October 20, 2005. Discussions were held with all [ ] offerors remaining in the competitive range.

17. Final Proposal Revisions (FPRs) were requested from the offerors on November 10, 2005. FPRs were received on November 15, 2005 and the agency conducted a final review of all proposal changes.

E. Award To Data Monitor Systems, Inc.

18. On December 1, 2005, award was made to Data Monitor Systems, Inc. of Midwest City, Oklahoma for $51,530,704.29 for a term of one base year plus 9 annual options and a short option of 6 months. The unsuccessful offerors were sent notifications of award the same day.

19. In arriving at the decision to award the contract to DMS, the agency determined that DMS was one of three offerors having the most highly rated performance risk assessment of Significant Confidence, meaning that little doubt exists that DMS can successfully perform the required effort. This finding was based [ ] performance including the Base Operating Support contracts at Dobbins ARB, GA and General Mitchell IAP-ARS, WI. DMS demonstrated Very Good past performance in all eight of the functional areas included in the Grissom ARB solicitation.

20. T Square Logistics Services, Inc. ["T Square"] was the [ ] evaluated price offeror but received an overall confidence assessment of [ ], which meant that [ ]. Specifically, T Square did not provide any [ ]. Thus, notwithstanding the [ ] contracts with [ ] performance data which covered [ ] of the eight functions and a very small portion of a [ ] function, the agency's level of confidence in T Square was substantially reduced because of a lack of demonstrated ability to successfully perform <u>all</u> eight functions of the solicitation requirement.

21. The agency noted that T Square's total evaluated price is $[ ] represented $[ ] lower pricing annually than DMS, a difference of only [ ]%.

22. The agency determined that DMS's superior past performance record which demonstrated its ability to successfully perform all eight functions outweighed the mere [ ]% cost savings offered by T Square's proposal and the accompanying substantially lower performance risk assessment of [ ].

F. T Square's First Protest

23. T Square requested a debriefing which was provided December 21, 2005. T Square thereafter filed a protest with the General Accounting Office on December 27, 2005, which it supplemented on December 29, 2005. The agency suspended performance of DMS' contract by notice dated December 29, 2005. DMS intervened in the GAO protest shortly thereafter.

24. In its protest, T Square alleged that its proposal had been improperly evaluated. T Square did not rebut the agency's finding that T Square lacked relevant past performance in [ ], and had only partial past performance in the functional area of [ ]. T Square argued, however, that because it had been rated higher on allegedly similar procurements in the past, it was unreasonable for the agency to rate its proposal lower on the present procurement.

25. T Square also argued that DMS lacked past performance in some functional areas, an incorrect assertion which T Square never substantiated.

26. T Square also argued that the agency had failed to conduct meaningful discussions because the agency had not questioned T Square regarding its lack of

relevant past performance in those three functional areas during the discussion process. Notably, in none of T Square's protests did it argue that the agency had incorrectly interpreted past performance data. T Square admitted that it lacked past performance in those areas, but alleged that had the agency brought those gaps to T Square's attention, T Square would have added subcontractors with that experience.

### G. GAO Recommends Corrective Action

27. On February 13, 2006, after submission of the agency's protest report, the GAO convened an Alternative Dispute Resolution ["ADR"] teleconference for the purpose of providing outcome prediction to the parties. In that conference, the GAO attorney responsible for the matter indicated that in the GAO's view, because T Square's lack of past performance in the functional areas of [ ] was treated unfavorably by the agency in its evaluation, this constituted "adverse" past performance information upon which the agency was required to conduct discussions with T Square. The GAO gave no indication either in that conference or in its subsequent written decision on protest costs that it considered any other protest allegation to be meritorious.

28. The GAO recommended that the agency conduct discussions, re-evaluate the proposals, and re-accomplish the award decision. The GAO, however, left it to the agency to decide what action should and would be taken.

H. The Air Force Implements Corrective Action

29. On March 3, 2006, the agency formally advised the GAO as to the scope of corrective action the agency intended to take. The agency proposed a comprehensive seven part corrective action plan: (1) assign a new evaluator, (2) re-evaluate all offerors that received a "Go" in the "Go/No-Go" technical proposal evaluation for past performance relevance and performance risk, (3) assign a "neutral" performance risk rating for those functional areas in which an offeror lacks past performance experience, (4) re-assess the confidence assessment, (5) prepare a new past performance/cost trade-off analysis and best value determination, (6) prepare a new source selection document, and (7) if any offeror other than the current awardee is determined to be the best value, then terminate the award to Data Monitor, and make award to that offeror.

30. Although T Square challenged the propriety of the proposed corrective action because it did not necessarily permit T Square to change its entire team structure by adding new subcontractors to improve its score, the GAO expressed no opinion on the propriety of the proposed corrective action.

31. In intervention, DMS pointed out that the real issue was that the gaps in past performance T Square's proposal should have been scored as a "neutral" as required by FAR 15.305(a)(2)(iv), but that under clear GAO case law, the agency had no duty to conduct discussions regarding a lack of relevant past performance unless there was something unclear about the proposal in question, which in this case there

was not. Accordingly, if properly scored, T Square was not entitled to discussions on that issue, therefore the agency was not required to provide T Square with discussions as part of its corrective action.

32. The GAO dismissed the protest as mooted by the corrective action, noting that if T Square were unhappy with the result, it could always protest again.

33. In the meantime, the stop work order on DMS's awarded contract remained in place, costing DMS performance time on the contract (and related profit), as well as continually accumulating unabsorbed overhead costs.

I. Second Award To Data Monitor Systems, Inc.

34. After dismissal of the protest, the agency implemented its proposed corrective action plan. To DMS' knowledge, the agency implemented the plan exactly as it had proposed to GAO. On May 23, 2006, the agency announced its new award decision, which again found DMS' proposal to offer the best value to the Government.

J. Second T Square Protest

35. On May 30, 2006, T Square again protested to the General Accounting Office. T Square's protest indicated that in the re-evaluation, the agency had treated T Square's gaps in past performance as "neutral", as the agency had indicated to GAO it would do. T Square's protest also indicated that as a result, T Square's overall

confidence rating was raised from the previous [ ] to [ ]. Nevertheless, T Square remained unhappy with the ultimate result and argued again that the agency was required to conduct discussions with T Square to permit T Square to entirely change the composition of its contracting team so that it could add subcontractor experience it decided not to add in its initial proposal.

K. Second Proposed Corrective Action

36. On June 13, 2006, the agency informally advised DMS that it intended to institute yet another round of corrective action. Moreover, the agency proposed to terminate DMS' contract in the meantime, rather than leave the contract in place as it had done before. The stated basis for this action was change in the performance period (as a sole result of protest delays), a revision to the Department of Labor wage determination, and unspecified changes to the Performance Work Statement.

37. Changes in the performance period to account for protest delays, and incorporation of revised minimum wage determinations are matters normally handled post-award via routine contract modification and are not cardinal changes that require a new competition. Furthermore, on information and belief, the proposed changes to the PWS are minor in nature, completely within the scope of the Changes clause, and likewise are not cardinal changes of the type that require a new competition.

38. It is DMS' belief, based upon the agency's action, that its decision to take corrective action yet again was not motivated by either needed changes to the

Solicitation, nor a belief on the part of the agency that it had committed any impropriety in the administration of the first corrective action. Rather, the agency expressed a concern that the GAO mighty rule that discussions were required even though such a ruling would be contrary to GAO precedent, and even though GAO had expressed no opinion regarding the propriety of the corrective action when it was proposed.

## III. ARGUMENT

### A. Jurisdiction and Standard of Review

The Court has jurisdiction over this bid protest pursuant to 28 U.S.C. § 1491(b)(1). Section 1491(b) (4) explicitly provides that, in any action under 1491 (b), "the courts shall review the agency's decision pursuant to the standard set forth in Section 706 of Title 5," of the Administrative Procedure Act.

In reviewing decisions of administrative agencies, such as the United States Department of the Air Force, the Court can declare unlawful and can set aside all agency action, findings, and conclusions that it finds "arbitrary, capricious, an abuse or discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). The protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law or procedure. Gentex Corp. v. United States, 58 Fed.Cl. 634, 648 (2003). Info. Tech. & Applications Corp. v. United States, 51 Fed.Cl. 340, 346 (2001), aff'd, 316 F.3d 1312 (Fed. Cir.2003); Bannum, Inc. v. United States, 60 Fed.Cl. 718 (2004); Hunt Building Co., Ltd. v. U.S., 61 Fed.Cl. 243, 269 (2004).

B. <u>The Proposed Corrective Action Addressed The Real Issue Presented- Evaluation of a Lack of Past Performance</u>

It was clear on the record before GAO, and was unrebutted by T Square, that T Square lacked relevant past performance in several functional areas under the solicitation. The agency's original evaluation of proposals treated that lack of relevant past performance as adverse. It was GAO's decision that because T Square's lack of past performance in certain areas was treated as adverse resulting in a "low confidence" overall rating, the agency was required to conduct discussions with T Square.

However, the agency's corrective action that was taken recognized that a lack of past performance in an area should be treated as neutral, not as adverse. The assignment of a neutral score for a lack of past performance is not discretionary with the agency, it is mandated by the FAR. FAR 15.305(a)(2)(iv) states that an offeror "without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance." Accordingly, the agency clearly erred in the initial evaluation when it evaluated T Square unfavorably in past performance in those areas in which T Square had no relevant past performance. The proper scoring would have been neutral.

That scoring issue was the actual impropriety, the question of whether discussions should have been conducted is necessarily secondary to whether the proposals were scored properly in the first place. In its corrective action in response to

the first protest, the agency rectified that scoring error by scoring T Square neutral in the area in which it had no experience. Once that was done, and T Square's admitted lack of past performance in those functional areas was treated as neutral, then there was no need for discussions. There is nothing more for T Square to explain about its past performance, and that past performance would no longer be treated as adverse.

The facts of this case fall squarely with those in Standard Communications, Inc., B- 296,972, Nov. 1, 2005, 2005 CPD ¶ 200. There the GAO plainly held that a neutral past performance score assigned for lack of past performance in a given area does not require discussions, even where such neutral score ultimately becomes an award discriminator. The GAO there stated:

> SCI asserts that the agency improperly failed to provide it with discussions in the area of past performance. Had it done so, SCI maintains, it easily could have dispelled the agency's concerns.
>
> The scope and extent of discussions are largely matters of the contracting officer's judgment. An agency is not required to afford offerors all-encompassing discussions, or to discuss every aspect of a proposal that receives less than the maximum score, and is not required to advise an offeror of a minor weakness that is not considered significant, even where the weakness subsequently becomes a determinative factor in choosing between two closely ranked proposals. We review the discussions provided only to determine whether the agency pointed out weaknesses that, unless corrected, would prevent an offeror from having a reasonable chance for award. Northrop Grumman Info. Tech., Inc., B-290080 et al., June 10, 2002, 2002 CPD para. 136 at 6.
>
> The agency's decision not to discuss SCI's past performance record is unobjectionable. As discussed above, the agency reasonably found that SCI's past performance submissions, on their face, were only partially

> relevant, and thus would not support a rating of high confidence. An agency must discuss significant weaknesses and adverse past performance information to which an offeror has not yet had an opportunity to respond. Federal Acquisition Regulation sect. 15.306(d)(3). However, the agency had no questions about the relevance of SCI's past performance and considered the unknown confidence rating to be essentially neutral and not adverse in the sense that it reflected a finding of a history of performance problems. Contracting Officer's Statement at 6; AR at 12. Where the nature and ultimate relevance of past performance information is clear to the agency, and the offeror received a neutral rating, the agency need not conduct discussions or otherwise communicate with the offeror regarding the information. See CMC & Maint., Inc., B-292081, May 19, 2003, 2003 CPD para. 107 at 3; Caltech Serv. Corp, B-261044.4, Dec. 14, 1995, 95-2 CPD para. 285 at 7 n.9.

Id.

Thus, if T Square's proposal was properly scored as the agency has already done as part of the first corrective action , there was no duty to conduct discussions. T Square did not allege before GAO that the agency misunderstood any portion of its past performance proposal, or that T Square actually possessed past performance that the agency believed T Square lacked. Rather, T Square, having learned through the protest process that its known lack of past performance ultimately became a determining factor in award, sought to make wholesale changes to its proposal by completely changing its contracting team.

In summary, T Square's lack of relevant past performance in certain areas was initially improperly scored as adverse in the initial evaluation. That treatment as adverse was the only reason discussions were even arguably required. The agency's corrective action remedied that improper adverse treatment by properly scoring those areas as neutral. Once that remedy was applied, there was no need for discussions

because T Square's lack of past performance in those areas was undisputed. Standard Communications, supra.

C. The Proposed Solicitation Changes
Do Not Warrant Re-Opening Competition

The agency has indicated that it intends to make the following changes to the solicitation: 1) alteration of the performance period to reflect delays caused by the protest process, 2) incorporation of a revised wage determination, and 3) very minor changes to the performance work statement. None of these changes require a re-opening competition.

With respect to the first item, delays caused by the protest process are specifically contemplated in the FAR, specifically FAR 52.233-1 "Protest After Award" which provides in pertinent as follows:

> (a) Upon receipt of a notice of protest (as defined in FAR 33.101) or a determination that a protest is likely (see FAR 33.102(d)), the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by this contract. The order shall be specifically identified as a stop-work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stop-page. ...
>
> * * *
>
> (b) If a stop-work order issued under this clause is canceled either before or after a final decision in the protest, the Contractor shall resume work. The Contracting Officer shall make an equitable adjustment in the delivery schedule or contract price, or both ...

FAR 52.233-1. Accordingly, the standard FAR protest clause specifically anticipates that an adjustment to the contract schedule may be made to account for delays caused by the protest process. No re-opening of competition is required.

With respect to the second item, insertion of a new wage determination, the FAR also clearly contemplates such action post-award and provides a mechanism for handling it. FAR 52.222-43 "Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts)" provides a mechanism for adjusting the contract price to accommodate wage determination revisions after award.

Accordingly, as there is a routine post award mechanism for handling revisions to wage determinations, re-opening of competition is not required. Furthermore, as all a wage determination change would do would be to raise the minimum wages required of all offerors, there is no reasonable basis to believe that a new wage determination would alter the relative competitive standing of the offerors.

As to the final item, the changes proposed to the statement of work, to DMS' knowledge, do not rise to the level of a "cardinal change". Only a cardinal change to contract requirements requires re-opening of competition after an award has been made. HG Properties A, LP, B- 290,416, B- 290416.2, July 25, 2002, 2002 CPD ¶ 128 (changed of site of construction of building to be leased did not require recompetition of lease requirement); Master Security, Inc. , B- 274,990, B- 274990.2, January 14, 1997, 97-1 CPD ¶ 21 (addition of five additional sites for guard services did not require re-opening of competition); Cardinal Maintenance Services v. United States, 63 Fed. Cl. 98, 107 (2004) (cardinal changes occurred where contracting officer identified changes

as "considerable" with costs that were potentially "extremely excessive"). Here the changes to be made by the agency are not "considerable", and would not result in cost changes that were "extremely excessive", indeed may not result in cost changes at all. Accordingly, re-opening of competition to accommodate those changes is not required.

D. The Agency's Decision to Take Corrective Action is Unreasonable

As shown above, there exists no reasonable basis for the agency to take a second round of corrective action in response to T Square's latest protest. Regarding the use of corrective action, the Court of Federal Claims has stated that will not "object to an agency's proposed corrective action provided it is 'reasonable under the circumstances,' and 'appropriate to remedy the impropriety[.]" ManTech Telecommunications and Information Systems Corp. v. United States., 49 Fed. Cl. 57, 65 (2001) quoting DGS Contract Serv., Inc. v. United States, 43 Fed.Cl. 227, 238 (1999); accord Rockville Mailing Serv., Inc., 96-1 CPD ¶ 184, at 3. "In order to make these assessments, the court, per force, must review the improprieties-whether alleged or actual-that gave rise to the proposed corrective action under review." ManTech at 65 citing Patriot Contract Servs., LLC, et al., B-278276.11, 98-2 CPD ¶ 77, at 4; Oshkosh Truck Corp.; Idaho Norland Corp., B-237058.2, B-237058.3, 90-1 CPD ¶ 274, at 4.

Here, the agency's proposed corrective action, termination of DMS' contract and solicitation of revised proposals, is simply not reasonable under the circumstances. That is so because quite simply, there is no impropriety to correct.

Case law of the GAO and this Court is abundantly clear that it is the duty of each offeror to put forth its best technical and price proposal in its initial proposal. Radian, Inc., B- 256,313, et al., 94-2 CPD ¶ 104; Will-Burt Co., B-250626.2, Jan. 25, 1993, 93-1 CPD ¶ 61. Offerors may not reasonably put forth less than their best technical and price terms hoping it will be "just enough" to win, without assuming the risk that it will not be enough to win the contract. Likewise, offerors cannot assume that the Government must spoon feed them the exact proposal changes that will make them the successful awardee.

Here, T Square made a conscious choice to propose that it perform the elements of [ ] with its own efforts, presumably in order to lower its price by avoiding subcontractor overhead and profit. T Square knew it lacked past performance in those functional areas, but because those shortcomings had not prevented it from winning other contracts, T Square assumed that those shortcomings would not prevent it from winning this contract as well.

T Square miscalculated. Because of the extremely close pricing, those shortcomings, though perhaps not major weaknesses in themselves became the determining factor in award.

Now T Square claims it had a right to be told that its proposal, though acceptable and competitive, was not quite competitive enough. T Square claims it had a right to be told that the conscious risks it took in crafting its proposal were lost. T Square knew it lacked past performance in those areas, there is nothing T Square would be told in discussions that it did not know before it ever submitted its proposal.

Moreover, T Square has never denied that it lacks past performance in those areas. There is nothing to discuss. There is only T Square's desire for "another bite at the apple". The purpose of discussions is not to save offerors from their own ill-considered business risks.

That is exactly the logic underpinning the GAO's decision in Standard Communications, Inc. , supra. The lack of past performance in the functional areas of [ ] in isolation, were not significant weaknesses, indeed T Square received a score of [ ] even with those weaknesses. As in Standard Communications, the fact that those weaknesses ultimately may have become a discriminating factor for award does not change their character. The information was clear, there was nothing to discuss. T Square took a knowing gamble with its proposal hoping to be more competitive, and lost that gamble.

Because T Square has no legal right to discussions, there is no reasonable basis for the agency to take corrective action, particularly the drastic action of terminating a contract which it twice decided to award to DMS. The agency's decision to take corrective is motivated out of fear that the GAO might issue a decision that would be unsupported by GAO's own precedent.

There is no basis to believe that GAO would depart from the standards it enunciated in Standard Communications. The GAO expressed no opinion as to whether the agency would required to conduct discussions if T Square's proposal had been properly scored. The GAO simply held that because the agency had treated T Square's lack of past performance in certain areas as adverse (which is contrary to

express provisions of the FAR), discussions were required. There is no basis for the agency to believe that the GAO would still recommend discussions where those gaps in performance were no longer treated as adverse, and T Square's scoring had been raised accordingly. In any event, the agency should chart its course not on what it thinks a GAO attorney may or may not think, but rather whether the agency itself is satisfied that its actions are rational and legal.

E. Criteria for Injunctive Relief

In order to obtain temporary relief, DMS must demonstrate:

1. substantial probability that the Plaintiff will prevail on the merits;
2. irreparable harm to the Plaintiff unless the injunction is granted;
3. absence of substantial harm to other interested parties; and
4. absence of harm to the public interests.

Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 291 (D.C. Cir. 1959). However, the evidence presented for each of these criteria is balanced by the court on a sliding scale basis. A much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841 (D.C.Cir. 1972).

The Plaintiff will address the four above enumerated factors in light of the facts and applicable cases. For the reasons set forth below, Plaintiff submits that it is entitled to the relief sought.

1. Likelihood of Success on The Merits

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has consistently held that the "likelihood of success" is a flexible factor and does not require a certain "mathematical probability." Magellan Corn v. United States, 27 Fed. Cl. 446, (1993); TRW Environmental Safety Systems, Inc. v. United States, 16 Ct.Cl. 529 (1989) . For purposes of a preliminary injunction, it is sufficient if the plaintiff can demonstrate either (1) "a combination of probable success on the merits and the possibility of irreparable injury," or (2) "that serious questions are raised and the balance of hardships tips sharply in favor" of the plaintiff. Id. at 527. As demonstrated below, DMS's request for preliminary injunctive relief meets these standards. In the first instance, the legal errors complained of above are straightforward and clear. The agency's decision to terminate DMS' contract and reopen competition after disclosure of DMS's price is irrational as there exists no legal basis for such action. There is nothing to correct. Prior precedent indicates that the agency's actions were entirely proper and need no correction.

2. DMS Will Suffer Irreparable Harm If Relief Is Not Granted

As this Court's predecessor stated in TRW, supra:

> ... plaintiff moving for preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits there under.... [This is] based upon the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs. (At p 529)

See also Quality Transportation Services, Inc. v. United States, 12 Cl.Ct. 276, (1987) (irreparable harm is shown if a contract will not be awarded and the plaintiff would not earn the resulting profits) and Isratex, Inc. v. United States, 25 Cl.Ct. 223 (1992), (a plaintiff is irreparably damaged since an action at law allows plaintiff to recover only its bid preparation costs). Here, as in the above cited cases, if injunctive relief does not issue, DMS will suffer that same harm in the form of lost profits that befalls every Plaintiff to a bid protest, greater here than in the usual bid protest because here DMS actually has been awarded the contract. There is no cognizable action by a terminated contractor for money damages for such lost profits. The harm to DMS would therefore be unremediable. DMS would further be forced to compete yet again for a contract it has already twice won against competitors which have full knowledge of its price and overall scoring, while DMS has no such knowledge about its competitors.

3. The Harm to DMS Outweighs the Harm to the United States

The Court must consider whether a preliminary injunction will substantially injure the other parties in the proceeding. As discussed above, if DMS' request for injunctive

relief is not granted, it will suffer the loss of a contract and the profits associated with it. The United States, if enjoined, still has contractual vehicles available through which it can continue to obtain the needed services uninterrupted. Indeed, under Defendant's proposed course of action it would continue to do so for the foreseeable future regardless of whether injunctive relief is issued.

### 4. Injunctive Relief Will Serve the Public Interest

It is a well-settled principle that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring the Government to the follow its procurement statutes and regulations. Issue of an injunction will protect the integrity of the procurement process, thereby effectuating the purposes of the Competition in Contracting Act, 10 U.S.C. § 2301, et seq. and applicable provisions of the Federal Acquisition Regulations intended to ensure fair and rational decision making in the procurement process.

## IV. CONCLUSION

DMS respectfully submits that the requested relief is urgently needed to maintain the status quo until the court reaches a decision on the merits. Based on the foregoing facts and analysis, DMS respectfully requests the Court to grant its Application for Temporary Restraining Order and Motion for Preliminary Injunction.

Dated:June 20, 2006

Respectfully Submitted,

Johnathan M. Bailey
SBN 24000009

BAILEY & BAILEY, P.C.
115 East Travis Street, Suite 711
San Antonio, Texas 78205-1614
Telephone: (210) 225 7747
Facsimile: (210) 225 8246

Attorney for Plaintiff
DATA MONITOR SYSTEMS, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above and foregoing Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction has been caused to be delivered by Overnight Delivery to the following this 19th day of June, 2006, by the undersigned.

Mr. Michael Dufault
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Facsimile (202) 305-7644
Airbill Number 851298456755

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Facsimile (202) 305-7644
Airbill Number 851298456777

Ms. Jana P. McNeal
Contracting Division
HQ AFRC/LGCP
1000 Corporate Pointe
Warner Robins, GA 31088-3430
Airbill Number 851298456766

JOHNATHAN M. BAILEY