# In the United States Court of Federal Claims

No. 06-471C
Filed: November 20, 2006*

| | | |
|---|---|---|
| DATA MONITOR SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>T SQUARE LOGISTICS CORP., INC.,<br><br>Defendant-Intervenor. | ) | Bid Protest: This court does not have jurisdiction under 28 U.S.C. § 1491(b) to enjoin the termination of a contract, and will not enjoin a resolicitation where the protestor has failed to point to any violation of a specific statute or regulation and has failed to demonstrate that the agency's decision to resolicit was arbitrary. |

Johnathan M. Bailey, Bailey & Bailey, P.C., San Antonio, TX, attorney of record for plaintiff.

William P. Rayel, with whom were Assistant Attorney General Peter D. Keisler, Director David M. Cohen, and Assistant Director Deborah A. Bynum, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. Michael J. O'Farrell, Jr., U.S. Air Force Legal Operations Agency, Arlington, VA, of counsel.

Richard B. Oliver, McKenna Long & Aldridge LLP, Los Angeles, CA, attorney of record for defendant-intervenor.

---

* This opinion was originally issued under seal on November 9, 2006. The court now releases the decision for publication with the redactions proposed in defendant's November 17, 2006, filing. Neither plaintiff nor the defendant-intervenor offered any redactions.

## OPINION

WIESE, Judge.

Plaintiff, Data Monitor Systems, Inc. ("DMS"), was the successful bidder on a contract initially awarded by the United States Air Force on December 1, 2005, to perform base operation support services at Grissom Air Reserve Base in Indiana. Following a protest filed by T Square Logistics Corporation ("T Square"), the defendant-intervenor here, the Air Force conducted a proposal reevaluation which resulted in a reconfirmation of the award to plaintiff. T Square again protested. Thereafter, the Air Force announced its intention to terminate the contract awarded to plaintiff and to resolicit its requirements under a new procurement. Plaintiff in turn filed suit in this court seeking, inter alia, injunctive relief from the proposed contract termination and resolicitation.

This case is now before the court on defendant's motion to dismiss the complaint pursuant to RCFC 12(b)(1) or, in the alternative, on the parties' cross-motions for judgment upon the administrative record pursuant to RCFC 52.1(b). The court heard oral argument on October 19, 2006, at the conclusion of which it ruled in defendant's favor and dismissed plaintiff's complaint.[1] This opinion formalizes the court's earlier ruling.

## FACTS

On June 6, 2005, the Air Force issued a solicitation seeking offers from qualifying small businesses to perform base operation support services at Grissom Air Reserve Base for a period of one year plus nine option years. The solicitation, which was to be conducted as a "best value solicitation," informed offerors that in the evaluation of proposals "assessment of Present/Past Performance is essential . . . and relative capability to meet performance requirement[s] . . . is significantly more important than Evaluated Price."

Pursuant to the guidelines set forth in the solicitation, the Air Force rated each offeror's past performance history according to the following scale: "Exceptional,"

---

[1] Notwithstanding the court's bench ruling dismissing the entirety of the complaint for lack of jurisdiction, the dismissal of plaintiff's challenge to the proposed resolicitation should more properly be construed as falling under RCFC 52.1(b).

"Very Good," "Satisfactory," "Neutral," "Marginal," or "Unsatisfactory."[2] The Air Force then reviewed an offeror's present/past performance information to make an overall confidence assessment of the offeror's ability to perform the total proposed effort, using ratings of "High Confidence," "Significant Confidence," "Confidence," "Unknown Confidence," "Little Confidence," or "No Confidence."[3] Employing this

---

[2] The solicitation defined the past performance rating scale as follows:

Exceptional: The contractor's performance meets contractual requirements and exceeds many requirements to the Government's benefit. The contractual performance was accomplished with few minor problems for which corrective actions taken by the contractor were highly effective.

Very Good: The contractor's performance meets contractual requirements and exceeds some requirements to the Government's benefit. The contractual performance was accomplished with some minor problems for which corrective actions taken by the contractor were effective.

Satisfactory: The contractor's performance meets contractual requirements. The contractual performances contained some problems for which corrective actions taken by the contractor appear or were satisfactory.

Neutral: No performance record identifiable.

Marginal: The contractor's performance does not meet some contractual requirements. The contractual performance reflects a serious problem for which the contractor has not yet identified corrective actions or the contractor's proposed actions appear only marginally effective or were not fully implemented.

Unsatisfactory: The contractor's performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance contains serious problems for which the contractor's corrective actions appear or were ineffective.

[3] The solicitation defined the overall confidence ratings as follows:

High Confidence: Based on the offeror's performance record, essentially no doubt exists that the offeror will successfully perform

(continued...)

evaluation system, the Air Force determined that DMS demonstrated a "Very Good" past performance in all eight of the functional areas included in the solicitation,[4] earning it an overall rating of "Significant Confidence." T Square, by contrast, received an overall rating of "Little Confidence" based on the fact that T Square's proposal had not included past performance data relating to two of the eight major functional areas identified in the solicitation (traffic management and meteorological services) and had not fully addressed the past performance data requirement relating to repair and maintenance of facilities. In addition, the Air Force determined that DMS and T Square had total evaluated prices of $51,530,704 and $51,194,267, respectively.

Based on these evaluations, the Air Force awarded the contract to plaintiff on December 1, 2005, notifying the unsuccessful offerors, including T Square, the same day. T Square in turn requested a debriefing from the Air Force which it received on December 21, 2005. Thereafter, on December 27, 2005, T Square filed a protest before the Government Accountability Office ("GAO"), arguing that the Air Force had improperly evaluated T Square's past performance by giving it a lower rating in the areas of traffic management and meteorological services than it had received in two previous, allegedly similar procurements, and had failed to conduct the required discussions in connection with that past performance. In response, the Air Force

---

[3] (...continued)
the required effort.

Significant Confidence: Based on the offeror's performance record, little doubt exists that the offeror will perform the required effort.

Confidence: Based on the offeror's performance record, some doubt exists that the offeror will perform the required effort.

Unknown Confidence: No performance record identifiable.

Little Confidence: Based on the offeror's performance record, substantial doubt exists that the offeror will perform the required effort.

No Confidence: Based on the offeror's performance record, extreme doubt exists that the offeror will perform the required effort.

[4] The range of services sought under the solicitation covered all major functions of the base, including base supply, motor vehicle management, traffic management, transient aircraft services, real property maintenance and services, fuels management, airfield management, and meteorological services.

suspended performance of plaintiff's contract on December 29, 2005, pending resolution of T Square's protest.

On January 27, 2006, the Air Force submitted its formal agency report to the GAO in response to T Square's original protest and to its first and second supplemental protests filed on December 29, 2005, and January 3, 2006, respectively. In that report, the contracting officer explained that there was no inconsistency in the rating of T Square's performance in the various procurements because the standard for award in the current solicitation differed from the standard employed in the previous procurements cited by T Square. Specifically, the contracting officer noted:

> In March 2005, the . . . evaluation criteria clause, previously used in similar acquisitions for other installments was changed from stating that Present/Past performance is ". . . **somewhat** more important than Evaluated Price in the evaluation" to stating that Present/Past performance is ". . . **significantly** more important than Evaluated Price in the evaluation." Along with this change in terminology, the methodology of the structured approach was modified to include the noteworthy comments in the overall Confidence Assessment rather than a separate item the [Source Selection Authority] considered for award. The lack of experience in particular function(s) is still weighed in either of these structured approaches, but the new methodology is more consistent with the revised language in the solicitation.

In addition, the Air Force explained that it had not conducted discussions regarding T Square's past performance because "[t]he lack of very relevant performance data in two functions and only part of another function was never deemed a deficiency, weakness or adverse past performance information which could be resolved or corrected via discussions; therefore, no discussions were deemed necessary."

The GAO conducted an Alternative Dispute Resolution ("ADR") conference on February 13, 2006, to address T Square's protest claims. According to the GAO's subsequent summary of the proceeding, the parties were informed at the conference of the GAO attorney's view that "the likely outcome of the protest was that it would be sustained, and that the likely protest recommendation would be that the agency reopen discussions, conduct further discussions with T Square and the other offerors, request revised proposals, and make a new source selection decision, fully documenting the basis for that decision."

Although not bound by the recommendations offered in the ADR proceeding, the Air Force notified the GAO on March 3, 2006, that it intended to take corrective action to remedy the lack of discussions with T Square. Specifically, the Air Force

indicated that it would (1) assign a new evaluator; (2) reevaluate all offerors that had received a "Go" in the "Go/No Go" technical proposal evaluation for past performance relevance and performance risk; (3) assign a "neutral" performance risk rating for those functional areas for which an offeror lacks past performance experience; (4) reassess the confidence rating; (5) prepare a new past performance/cost trade-off analysis and best-value determination; (6) prepare a new source selection document; and (7) in the event that an offeror other than DMS is determined to be the best value, terminate the contract with DMS and make the award to that offeror. The Air Force did not, however, represent that it would reopen discussions.

On March 7, 2006, T Square submitted a written objection to the Air Force's proposed plan on the ground that it omitted conducting meaningful discussions with respect to T Square's past performance. In a March 8, 2006, response, DMS argued that while T Square's past performance should indeed have been scored as "neutral" rather than having been given an adverse rating, no additional discussions were required because T Square's proposal was clear. The Air Force similarly took the position that discussions were unnecessary.

On the basis of the Air Force's proposal and despite T Square's written objection, the GAO dismissed the protest as moot on March 14, 2006. The GAO explicitly stated, however, that its decision did not address whether the agency's proposed corrective action was appropriate. Thereafter, in an April 26, 2006, decision, the GAO recommended that the Air Force reimburse T Square for its protest costs based on the Air Force's undue delay in taking corrective action in response to a "clearly meritorious protest"—a determination based on the GAO's conclusion during the ADR conference that T Square's lack of experience in three functional areas "directly resulted in a 'low confidence' rating," that this rating was the "reason that T Square was not considered for award notwithstanding its lower price," and that once the Air Force had decided to conduct discussions, "it was obligated to point out T Square's evaluated lack of experience in these functions in order for the discussions to be considered meaningful."

After the GAO's dismissal of the protest, the Air Force implemented its corrective action plan. Upon reconsideration of T Square's bid, the Air Force again concluded, based on twelve previous contracts, that T Square lacked identifiable past performance in the functional areas of traffic management and meteorological services, and had only "somewhat relevant" past performance in the area of real property maintenance. This time, however, the Air Force assigned T Square an overall rating of "Confidence" (versus its previous rating of "Little Confidence"), reflecting its assessment that "some doubt" existed as to T Square's ability to perform all functions of the solicitation.

On May 11, 2006, the Source Selection Authority executed a new source selection decision, once again identifying DMS as the offeror presenting the best value to the government. In explaining the rationale for that decision, the Source Selection Authority observed:

> DMS is one of two offerors having the most highly rated confidence assessment of High Confidence whereby essentially no doubt exists that the offeror can successfully perform the required effort. This assessment for DMS is based on Very Relevant contracts with Very Good performance . . . . DMS demonstrated Very Good past performance in all eight of the functional areas . . . . Their total evaluated price is $51,530,704.29. The other offeror with High Confidence had a total evaluated price approximately [**REDACTED]** higher than that of DMS and did not offer any better value that justified its higher price.

The Source Selection Authority additionally noted that of the two offerors with prices lower than DMS's—**[REDACTED]**, with a **[REDACTED]** rating and a total evaluated price of **[REDACTED]** (representing **[REDACTED]** lower pricing annually) and T Square with a "Confidence" rating and a total evaluated price of $51,194,266.99 (representing $33,643.73 lower pricing annually)—neither provided cost savings that outweighed DMS's higher confidence assessment.

On May 30, 2006, T Square filed a second protest with the GAO, challenging the revised award determination, again on the ground that the Air Force should have conducted discussions regarding T Square's lack of performance in traffic management, meteorological services, and real property maintenance. On June 13, 2006, the Air Force advised the GAO that it intended to take a second corrective action, this time by (1) terminating DMS's contract; (2) amending the solicitation to change the period of performance, incorporate revised wage determinations, and amend the Performance Work Statement; (3) reopening discussions; (4) allowing revised proposals; and (5) making a new best-value determination.[5] Based on the Air Force's proposed corrective action, the GAO in turn dismissed T Square's second protest as academic on June 14, 2006. Plaintiff filed the instant action on June 21, 2006.

---

[5] The contracting officer additionally faxed a memorandum for record to the Air Force trial attorney on June 13, 2006, proposing the same corrective action that had been communicated to the GAO.

## DISCUSSION

Plaintiff's complaint consists of essentially two components: the contention that the Air Force's proposed termination of its contract is wrongful and the contention that the Air Force's decision to resolicit is arbitrary and therefore unlawful. Defendant, for its part, maintains that the court does not have jurisdiction over either aspect of plaintiff's claim because contract termination is reviewable only under the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601–613 (2000), and because plaintiff's challenge to the proposed resolicitation does not fall within this court's bid protest jurisdiction, 28 U.S.C. § 1491(b)(1) (2000), since it does not involve an objection to a solicitation, a proposed award, an award or a violation of statute or regulation related to a procurement as contemplated by that section.[6] Defendant additionally argues that plaintiff lacks standing to pursue its claim because it cannot demonstrate that it has been prejudiced by the Air Force's action, and that plaintiff has failed to satisfy the requirement of ripeness because, at this stage, any injury is purely conjectural.[7] Finally, defendant contends that even if the court in fact possesses jurisdiction over plaintiff's claim, the Air Force's decision to terminate the contract, amend the solicitation, and reopen discussions is amply supported by the facts confronting the agency and thus judgment should be entered on the administrative record.

As an initial matter, defendant is correct in asserting that the court lacks jurisdiction to enjoin the Air Force's termination of DMS's contract. Griffy's Landscape Maint. LLC v. United States, 51 Fed. Cl. 667, 673 (2001) (holding that

---

[6] 28 U.S.C. § 1491(b)(1) confers jurisdiction on this court "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement."

[7] In support of its ripeness argument, defendant notes that plaintiff does not yet know what amendments will be made to the solicitation, how discussions will be conducted, whether the Air Force will release information about the other offerors' bids, and whether any of those actions will work to plaintiff's detriment. Bannum, Inc. v. United States, 56 Fed. Cl. 453, 462 (2003) (holding that a court may not exercise jurisdiction over an unripe claim since it is "premised upon contingent future events that may not occur as anticipated, or indeed may not occur at all"). T Square additionally notes that the relief plaintiff seeks, if granted, would effectively decide T Square's other GAO protest grounds—including the Air Force's allegedly unreasonable evaluation of DMS's past performance and its failure to document its best value trade-off determination—without the benefit of a hearing before either this court or the GAO.

the awardee of a contract may not challenge the decision to terminate that contract by invoking the court's bid protest jurisdiction); Davis/HRGM Joint Venture v. United States, 50 Fed. Cl. 539, 544 (2001) (ruling that a contractor's challenge to a termination for convenience "does not fall within the express language of [28 U.S.C.] § 1491(b) because it does not relate to an interested party's objection to a solicitation, a proposed award, or an award"). Such a challenge may only be brought under the CDA, which requires that a claim first be submitted to the contracting officer. 41 U.S.C. § 605(a); Control Data Sys., Inc. v. United States, 32 Fed. Cl. 520, 524 (1994) (holding that "[o]nce a contract has been awarded, the administration of the existing contract is within the discretion of the agency and disputes are resolved . . . under the contract disputes clause and the Contract Disputes Act."); Sharman Co. v. United States, 2 F.3d 1564, 1568–69 (Fed. Cir. 1993) (ruling that a final decision by the contracting officer is a jurisdictional requirement under section 605 of the CDA).

Plaintiff argues, however, that its challenge to the Air Force's proposed termination of DMS's contract should be construed not as a contract claim under the CDA, but rather as a bid protest action. In plaintiff's view, a single set of operative facts can give rise to either a bid protest action or a contract claim under the CDA, a possibility it contends was recognized by the Armed Services Board of Contract Appeals in In re L-3 Communications Corp., ASBCA No. 54920, 06-2 BCA ¶ 33374, 2006 WL 2349233 (2006). In L-3 Communications, a contractor brought a breach of contract claim under the CDA challenging the award of a task order under a multiple award, indefinite quantity contract. The government moved to dismiss the claim under the theory that it should properly be characterized as a bid protest—a remedy unavailable to challenge the award of a task order. In finding that it indeed possessed jurisdiction to hear plaintiff's claim, the Board noted that "[t]he same actions of the government in awarding a delivery order under a multiple award indefinite quantity contract may theoretically be grounds for both a 'protest' seeking to cancel or modify the award and a 'claim' for damages for breach of the Awarding Orders clause of the contract." Id. Plaintiff thus characterizes its objection to the Air Force's contract termination as part of a larger challenge to the procurement process which properly falls within the scope of this court's bid protest jurisdiction.

That interpretation is further bolstered, in plaintiff's view, by the court's decision in Delaney Construction Corp. v. United States, 56 Fed. Cl. 470 (2003). In Delaney, a disappointed bidder filed a series of protests which culminated in an action before the GAO challenging the agency's failure to include a HUBZone evaluation preference in the original solicitation. In response to that protest, the agency proposed to take corrective action, including terminating the contract award to Delaney, amending the solicitation to incorporate the HUBZone evaluation preference clause, and reopening competition. Delaney in turn filed suit, seeking to enjoin the agency from taking such corrective action. In finding that it possessed

jurisdiction over plaintiff's claim, the Delaney court distinguished its case from the scenarios in both Davis/HRGM and Griffy's Landscape by noting that "[i]n essence, plaintiff is not asserting a contract claim addressed to the termination of the . . . contract." The court went on to explain:

> The corrective action proposed by the Corps of Engineers involves returning the status of this procurement to its pre-award stage with the result that the subject matter of the protest concerns the offerors' objections to submitting new price proposals to obtain the road contract. With respect to the proposed corrective action, plaintiff is a prospective offeror whose direct economic interest would be affected by the new award of the contract which would occur on the basis of the corrective action at issue. Plaintiff is not attempting to protest solely as a contract awardee.

Id. at 474 (citations omitted). The Delaney court, in other words, distinguished between situations in which the protestor challenges the proposed corrective action in an ongoing procurement, as plaintiff claims is the case here, and cases in which the contract is merely terminated.

We do not regard either of the cases plaintiff cites, however, as authority for the proposition that a claim redressable under the CDA may be refocused as a claim for injunctive relief under the court's bid protest jurisdiction. In L-3 Communications, for example, the contractor presented its case as a claim for breach of contract under the CDA and the action was resolved on that basis. Although the Board did note that the same injury—an alleged violation of the contract's Awarding Orders clause—might also be resolvable through a protest action, that statement was merely dicta and informed no part of the Board's actual decision. Similarly, in Delaney, while the plaintiff presented its claim as a suit to enjoin a proposed contract termination, the court instead limited its relief to enforcement of the parties' rights to a proper evaluation of their bids to be conducted on the basis of their existing proposals. In other words, the Delaney court enjoined the resolicitation and not the contract termination. Each of these cases, then, should be understood simply as enforcing an existing right in the manner prescribed by law.

Moving on, then, to the Air Force's decision to resolicit, we find plaintiff's challenge similarly unavailing. Under 28 U.S.C. § 1491(b)(1), a plaintiff in a bid protest action must be an interested party objecting to (1) a solicitation; (2) a proposed award; (3) an award; or (4) an alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Plaintiff maintains that it is an interested party objecting to the "award of a federal procurement contract"

and "related violation of statute or regulation in connection with the procurement."[8] Plaintiff does not, however, point to any specific statute or regulation that was violated by the Air Force's decision to resolicit the contract; rather, plaintiff contends that the entire statutory scheme that governs procurements and permits agencies to reopen discussions is violated if the agency exercises its powers arbitrarily. Such a sweeping grant of jurisdiction, however, is not what section 1491(b)(1) intends. Rather, the violation claimed must be rooted in a specific statute or regulation and plaintiff alleges no such violation here.[9]

---

[8] In its complaint, plaintiff sets forth the basis for its action as follows:

> It is DMS's belief, based upon the agency's action, that its decision to take corrective action yet again was not motivated by either needed changes to the Solicitation, nor a belief on the part of the agency that it had committed any impropriety in the administration of the first corrective action. Rather, the agency expressed a concern that the GAO might rule that discussions were required even though such a ruling would be contrary to GAO precedent, and even though GAO had expressed no opinion regarding the propriety of the corrective action when it was proposed. This is not a rational basis for corrective action, particularly when that corrective action would deprive DMS of its contract and allow other offerors to submit revised proposals after DMS's price and some technical evaluation information had been given to other offerors in the technical debriefing [resulting in] a substantial competitive disadvantage due to exposure of its price and overall scoring to all other offerors.
>
> * * *
>
> The provisions of the FAR regarding the evaluation of gaps in past performance are clear. It is likewise clear that an agency is not required [to] conduct discussions regarding gaps in past performance. Accordingly, the agency's corrective action is unreasonable. The agency has committed no legal error, and its decision to take corrective action is not motivated out of a credible belief that it has committed legal error.

[9] Griffy's Landscape, 51 Fed. Cl. at 674, is not to the contrary. Although the court in that case exercised jurisdiction over the agency's decision to resolicit based on the protestor's objection to an "auction" as alleging a "violation of a statute or regulation in connection with a procurement or proposed procurement," we are (continued...)

Nor can the decision to resolicit, standing alone, possibly be construed as arbitrary. As an initial matter, the agency has wide discretion with respect to the manner in which it conducts its procurements, including the decision whether to conduct discussions. Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 574 (2002) (observing that contracting officers are "entitled to broad discretion to take corrective action if they determine 'that such action is necessary to ensure fair and impartial competition'" (quoting DGS Contract Serv., Inc. v. United States, 43 Fed. Cl. 227, 238 (1999)); Standard Communications, Inc., B-296,972, 2005 CPD ¶ 200, 2005 WL 3078884, at *5 (Comp. Gen. 2005) (noting that the "scope and extent of discussions are largely matters of the contracting officer's judgment"). That is especially the case since the question before us is not, in contrast to the proceeding before the GAO, whether the Air Force is obligated under the circumstances to conduct discussions, but whether it is in fact permitted to do so when it deems such discussions beneficial. Plaintiff concedes that the decision to conduct discussions with an offeror and the scope of any discussions are left to the discretion of the contracting officer. This principle necessarily means that the contracting officer has the discretion to decide in favor of conducting discussions. To hold otherwise would, as defendant points out, undermine the ability of the contracting officer to tailor a procurement and contract to meet the agency's needs. Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 242 (1997) (noting that an agency "should be able to conduct procurements without excessive infringement upon the agency's discretion").

More specifically, however, plaintiff has failed to meet its burden of proving, based on the already-existing administrative record, that the proposed corrective action was arbitrary. Plaintiff's argument is founded on the premise that it would be irrational for the Air Force to construe the GAO's statements as requiring the agency to conduct discussions, particularly since plaintiff contends that such discussions were not required by law.[10] Yet, in its April 26, 2006, decision regarding T Square's protest

---

[9] (...continued)
unwilling to take a similar approach here. We do not believe that plaintiff's contention that it has been prejudiced because its total evaluated price and a portion of its technical information were disclosed to other offerors as part of the contract debriefing rises to the level of alleging a "violation of a statute or regulation in connection with a procurement or proposed procurement." That is the case because any auction allegation is premature: the Air Force has made no decision on, nor even had the opportunity to address, plaintiff's June 14, 2006, letter, urging the Air Force to disclose the price and technical information of the other offerors. Such an allegation cannot therefore provide the basis for this court's jurisdiction.

[10] Plaintiff argues that this case is governed by Standard Communications,
(continued...)

costs, the GAO offered the following rationale for recommending that the Air Force reopen negotiations and conduct further discussions:

> During the ADR conference, the parties were informed by the GAO attorney that from her review of the record, it was clear that meaningful discussions were not conducted by the agency, where the protestor was not informed of the agency's concern that the firm lacked certain experience that resulted in a "little confidence" rating that caused the selection of another firm for award.

The GAO further explained:

> The record showed that the agency's determination that T Square was lacking in experience in three of the functional areas directly resulted in a "low confidence" rating, and that this rating was the reason that T Square was not considered for award notwithstanding its lower price. Under the circumstances, once the agency decided to conduct discussions—as it did in this case—it was obligated to point out T Square's evaluated lack of experience in [these functions] in order for the discussions to be considered meaningful.

Given this language, it seems more than reasonable for the Air Force to conclude that the GAO might similarly construe its corrective action as inadequate where a failure to conduct discussions resulted in an experience rating that caused the selection of another firm for award.[11] Indeed, the GAO specifically avoided weighing in on the propriety of the corrective action by noting in its March 14, 2006, decision dismissing the original protest that it did "not decide whether the agency's proposed

---

[10] (...continued)
B-296,972, 2005 CPD ¶ 200, 2005 WL 3078884, which it contends stands for the proposition that an agency "is not required to advise an offeror of a minor weakness that is not considered significant, even where the weakness subsequently becomes a determinative factor in choosing between two closely ranked proposals." Id. at *5. T Square counters that Standard Communications is distinguishable because T Square's lack of experience was a "significant weakness" requiring discussions under 48 C.F.R. (FAR) § 15.306(d)(3) (2005). We need not reach this issue, however, because the Air Force reasonably chose to avoid the time and expense of a protest it viewed as likely to be sustained.

[11] We offer no opinion as to whether discussions would have been required on these facts or whether the GAO, given the opportunity to review the corrective action, would so rule. We merely note that the Air Force was not unreasonable in its decision to conduct discussions.

corrective action is appropriate" and further observed that T Square was free to challenge both the GAO decision and the corrective action "[i]n the event that it does not receive the award."[12]

While the Air Force's first corrective action—the recharacterization of the gap in T Square's past performance as "neutral"—attempted to correct the deficiencies identified by the GAO, the reevalaution still resulted both in the Air Force's giving T Square an overall confidence assessment two levels below DMS's, and in the subsequent contract award to DMS despite T Square's lower price. The Air Force thus reasonably believed that the first corrective action continued to run afoul of the GAO's pronouncement that discussions were required where a lack of experience in certain functional areas caused a downgrade in a firm's confidence rating, which "caused the selection of another firm for award." In this regard, we note that "the government is not obliged to admit an error as a precondition to proposing corrective action," nor is it "necessary for an agency to conclude that the protest is certain to be sustained before it may take corrective action; where the agency has reasonable concern that there were errors in the procurement, even if the protest could be denied, [the GAO] view[s] it as within the agency's discretion to take the corrective action." ManTech Telecomm. and Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 72, n.24 (2001) (quoting SMS Data Prods. Group, Inc., B-280,970.4, 99-1 CPD ¶ 26, 1999 WL 40943, at *2 (Comp. Gen. 1999)). In short, we find the Air Force's corrective action—including its decision to reopen discussions—to be reasonable and well within its discretion.

## CONCLUSION

For the reasons stated at the oral argument held on October 19, 2006, and as further explained above, the Clerk is directed to enter judgment dismissing plaintiff's complaint.

s/John P. Wiese
John P. Wiese
Judge

---

[12] Plaintiff maintains that the record is silent as to the Air Force's rationale for proposing the second corrective action. Yet, as noted above, the contracting officer specifically represented in a memorandum faxed to the GAO on June 13, 2006, that the Air Force was proposing "the following corrective action to remedy the lack of discussions with the protestor regarding its lack of relevant past performance in certain functional areas."